UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: B.C.I. FINANCES PTY LIMITED (In Liquidation), *et al*.,<br>Foreign Debtors. | |
| ANDREW BINETTER, SAMANTHA KELLIHER, *and* MICHAEL BINETTER,<br>Appellants,<br>– *against* –<br>JOHN SHEAHAN, *in his capacity as Foreign Representative for the Foreign Debtors*,<br>Appellee. | **OPINION & ORDER**<br>25-cv-4815 (ER) |

RAMOS, D.J.:

Andrew Binetter, his wife, Samantha Kelliher, and his brother, Michael Binetter (the "Appellants") appeal from a January 18, 2022, order recognizing the liquidation proceedings of several Australian companies as "foreign main proceedings"[1] pursuant to Chapter 15 of the United States Bankruptcy Code. The Appellants argue that the bankruptcy court erred in granting recognition because the companies did not qualify as "debtors" under Section 109(a) of the Bankruptcy Code and thus were ineligible for Chapter 15 relief. For the reasons set forth below, the bankruptcy court's decision is AFFIRMED.

[1] A foreign main proceeding is "a foreign proceeding pending in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4). A debtor for the purposes of Chapter 15 is "an entity that is the subject of a foreign proceeding." 11 U.S.C. § 1502(1). And a foreign proceeding is "a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).

## I. BACKGROUND

The Court assumes familiarity with the facts, which are set forth in several of the bankruptcy court's thorough opinions. Although the cases underlying this appeal have a complicated procedural history, for the purposes of this appeal, it suffices to recount just the following facts.

This appeal arises out of long-running saga involving members of the Binetter family and their once-successful international juice empire. For decades, the Binetters operated their business through a complex web of entities based primarily in Australia. Ten of those companies eventually ended up in liquidation proceedings in Australia.[2] John Sheahan was appointed to serve as liquidator of these companies in each of these proceedings.

Under Chapter 15 of the Bankruptcy Code, a "foreign representative"—which the code defines as "a person or body . . . authorized in a foreign proceeding to administer the reorganization or the liquidation of [a] debtor's assets or affairs or to act as a representative of such foreign proceeding"—may petition a bankruptcy court for recognition of foreign proceedings in U.S. Bankruptcy Court. 11 U.S.C. §§ 101(24), 1515(a). If the bankruptcy court grants the petition, the foreign representative may then request additional discretionary relief, including the authority to take discovery in the United States. 11 U.S.C. § 1521(a)(4).

In 2017, Sheahan, in his role as a foreign representative (and hereinafter referred to the "Foreign Representative"), filed petitions on behalf of four of those companies (the "Prior Foreign Debtors") in the United States Bankruptcy Court seeking recognition of their liquidation proceedings as "foreign main proceedings" pursuant to Chapter 15.[3]

---

[2] The ten companies are: (1) B.C.I. Finances Pty Limited, (2) Binqld Finances Pty Limited, (3) E.G.L. Development (Canberra) Pty Limited, (4) Ligon 268 Pty Limited, (5) Gerobin Finances Pty Ltd, (6) Erbin Finances Pty Ltd, (7) Rawbin Finances Pty Ltd, (8) Marbin Finances Pty Ltd, (9) Erma Nominees Pty Ltd, and (10) Ligon 158 Pty Ltd.

[3] The Prior Foreign Debtors are: (1) B.C.I. Finances Pty Limited, (2) Binqld Finances Pty Limited, (3) E.G.L. Development (Canberra) Pty Limited, and (4) Ligon 268 Pty Limited.

*See, e.g.*, Doc. 9-1 at 55.[4] He subsequently filed recognition petitions on behalf of six additional Binetter companies (the "New Foreign Debtors") in 2021.[5] *See, e.g.*, Doc. 9-2 at 240. The cases were later consolidated for administrative purposes by the bankruptcy court.[6] Doc. 9-1 at 545.

The Appellants opposed each of these petitions.[7] They argued that none of the companies were eligible for Chapter 15 relief because they did not qualify as "debtors" under Section 109(a) of the Bankruptcy Code, which states that "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under" Title 11. 11 U.S.C. § 109(a). Section 109(a) applies to a debtor under Chapter 15. *In re Barnet*, 737 F.3d 238, 247 (2d Cir. 2013). Thus, to qualify for Chapter 15 relief, the Australian companies are required to meet Section 109(a)'s strictures. The Foreign Representative claimed that the companies met this requirement because they had each deposited a $1,250 retainer in the trust account of his United States counsel prior to the filing of the petitions and thus had "property in the United States." Doc. 9-1 at 95, 551. The Appellants argued that the companies' technical compliance with Section 109(a)'s property requirement should be disregarded because their deposits were made to manufacture eligibility under the statute. *Id.* at 107–20.

The bankruptcy court granted the Prior Foreign Debtors' and New Foreign Debtors' petitions in 2018 and 2022, respectively. *Id.* at 480–504; Doc. 9-2 at 565–69. In each instance, the bankruptcy court rejected the Appellants' objections to the companies'

---

[4] Record citations refer to the page numbers generated by ECF.

[5] The New Foreign Debtors are: (1) Gerobin Finances Pty Ltd, (2) Erbin Finances Pty Ltd, (3) Rawbin Finances Pty Ltd, (4) Marbin Finances Pty Ltd, (5) Erma Nominees Pty Ltd, and (6) Ligon 158 Pty Ltd.

[6] The Foreign Representative also petitioned for the recognition of the liquidation proceedings of an eleventh Binetter company, ACN 078 881 035 (which the parties refer to as "Shield"), in 2025, and that case was subsequently consolidated for administrative purposes with the aforementioned cases. Those proceedings, however, are not directly at issue in this appeal.

[7] Technically, of the Appellants, only Andrew Binetter opposed the Prior Foreign Debtors' petitions for recognition. Doc. 9-1 at 113. But Kelliher and Michael Binetter joined Andrew Binetter in objecting to the New Foreign Debtors' petitions. Doc. 9-2 at 295.

eligibility, finding that the attorney retainers satisfied Section 109(a)'s property requirement under the plain meaning of the statute.[8] The bankruptcy court noted in that regard that it is "well established" that a "debtor's funds held in a retainer account in the possession of counsel to a foreign representative constitute property of the debtor in the United States and satisfy the eligibility requirements of [S]ection 109," and that courts "have found the eligibility requirement satisfied by even a minimal amount of property located in the United States." *In re B.C.I. Finances Pty Ltd.*, 583 B.R. 288, 293–94 (Bankr. S.D.N.Y. 2018) (collecting cases). It also noted that this approach, wherein even "nominal amounts of property" satisfy the requirement, is consistent with how courts have interpreted Section 109(a) outside of the Chapter 15 context. *Id.* at 294 (collecting cases). And the bankruptcy court rejected the Appellants' invitation to set aside these precedents based on concerns about "manipulation and gamesmanship" because it concluded that it was bound by "the plain meaning of Section 109(a), as well as precedent in this jurisdiction and elsewhere finding retainers to constitute eligible property under that Section." *Id.* at 295.

The Foreign Representative moved for authorization to conduct discovery in April 2022, which the bankruptcy court granted in an order issued on May 16, 2022. Doc. 9-2 at 64–66. Specifically, the bankruptcy court authorized the Foreign Representative to: (1) "seek Bankruptcy Rule 2004 examinations and issue Bankruptcy Rule 2004 Subpoenas for documents, information and/or testimony without further order of" the bankruptcy court, subject to certain procedures, including for objections and motions to quash; and (2) "seek to enforce the terms of any Rule 2004 Subpoena, including, but not limited to, by moving to compel compliance therewith, in any court of competent jurisdiction without further order of" the bankruptcy court. *Id.* at 65–66. The bankruptcy

[8] The bankruptcy court wrote an opinion in support of its ruling on the Prior Foreign Debtors' petitions and adopted the reasoning of that opinion in its order granting the New Foreign Debtors' petitions. Doc. 9-2 at 568. Thus, the Court recounts the reasoning in the opinion granting the Prior Foreign Debtors' petitions.

court also set forth procedures for its consideration of any motion to quash a subpoena issued pursuant to its authorization order. *Id.* at 66.

The Foreign Representative issued subpoenas to the Appellants in November 2023. *Id.* at 68. The Appellants objected to the subpoenas on several grounds, including based on scope, burden, and Fifth Amendment privilege. Doc. 9-2 at 125–84. They also specifically objected to the requests insofar as they sought tax returns. *Id.* at 128, 146, 163. The Foreign Representative filed a motion to compel in July 2024. Doc. 9-1 at 26. After several rounds of briefing and a hearing, the bankruptcy court granted the motion to compel on March 10, 2025 (the "Compel Order"). Doc. 9-2 at 570–72. Specifically, the bankruptcy court ordered the Appellants to "produce to the Foreign Representative all non-privileged documents responsive to the Subpoenas within their possession, custody, or control," with two exceptions. *Id.* at 571. First, the Appellants were "not required to produce tax returns requested by the Subpoenas" at the time of the Compel Order. *Id.* Instead, the bankruptcy court held that "issues relating to the production of the demanded tax returns w[ould] be deferred until if and when the Foreign Representative determines there is a compelling need for such tax returns, at which point the parties w[ould] be directed to provide further briefing concerning the production of the tax returns." *Id.* Second, the bankruptcy court directed that "the relevant time period for any document request shall in no case begin prior to January 1, 2012." *Id.* The bankruptcy court also directed the parties to meet and confer regarding "any document or category of documents that [the Appellants] contend[ed] in good faith would be unduly burdensome to produce" and the Appellants to complete their production within thirty days, subject to their ability to seek an extension regarding specific requests. *Id.* at 572. Finally, the bankruptcy court ruled that, "to the extent the [Appellants] intend[ed] to invoke the Fifth Amendment act-of-production privilege in connection with any documents to be produced pursuant to the Subpoenas, the procedures for the [bankruptcy] [c]ourt and the parties to follow" regarding the invocation of that privilege would "be governed by a

separate order, the proposed form of which the parties [were required to] submit to the [bankruptcy] [c]ourt." *Id.*

The Appellants moved for reconsideration of the Compel Order on March 24, 2025. *Id.* at 766. The bankruptcy court denied the motion on May 20, 2025. *Id.* at 573.

The Appellants filed their notice of appeal on June 3, 2025. Doc. 1. The notice identified their appeal as arising from three orders: (1) the order granting the New Foreign Debtors' recognition petitions (the "Recognition Order"), (2) the Compel Order, and (3) the order denying reconsideration of the Compel Order.

## II. JURISDICTION

The Court must consider, at the outset, whether it has jurisdiction to hear this appeal. In general, federal district courts have jurisdiction "to hear appeals . . . from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings." 28 U.S.C. § 158(a). While "[i]n civil litigation generally, a court's decision ordinarily becomes 'final,' for purposes of appeal, only upon completion of the entire case," in bankruptcy cases, the concept of finality "is different." *Ritzen Group, Inc. v. Jackson Masonry, LLC*, 589 U.S. 35, 37 (2020); *see also In re Fugazy Express, Inc.*, 982 F.2d 769, 775 (2d Cir. 1992) ("[T]he concept of finality that has developed in bankruptcy matters is more flexible than in ordinary civil litigation."). Indeed, unlike orders entered in an ordinary civil case, "[o]rders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case." *Ritzen*, 589 U.S. at 37; *accord Fugazy Express*, 982 F.2d at 775 (explaining that "Congress intended to allow for immediate appeal in bankruptcy cases of orders that finally dispose of discrete disputes within the larger case" (citation modified)). That is because 28 U.S.C. § 158(a) allows for appeals from final decisions in "proceedings," rather than just "cases." *Ritzen*, 589 U.S. at 39.

The parties dispute whether any order appealed from here is final. The Appellants contend that the Recognition Order became a final when the bankruptcy court denied

their motion to reconsider the Compel Order. Doc. 9 at 11. In support of this contention, they rely on the Second Circuit's decision in *In re Barnet*, 737 F.3d 238 (2d Cir. 2013). In that case, which involved "an unusual jurisdictional thicket," the foreign representatives of an Australian company, Octaviar Administration Pty Ltd. ("OA"), petitioned for Chapter 15 recognition in U.S. Bankruptcy Court. *Id.* at 241. As part of an earlier investigation into OA's affairs, several affiliates of a separate company, Drawbridge Special Opportunities Fund LP ("Drawbridge"), were investigated and sued for AUD 210,000,000 in Australia. *Id.* at 243. After the bankruptcy court granted the recognition petition, Drawbridge appealed the recognition order to the district court. *Id.* However, while that appeal was pending, the bankruptcy court also issued an order authorizing the foreign representatives to conduct discovery from Drawbridge and other parties pursuant to 11 U.S.C. § 1521(a). *Id.* At the suggestion of the bankruptcy court, the parties then filed a joint application to appeal the recognition order directly to the Second Circuit, which the Second Circuit granted. *Id.*

Before deciding the merits, the Second Circuit first considered whether Drawbridge had standing to appeal the recognition order, even though Drawbridge was not named in that order or directly affected by its relief. *Id.* at 242–43. Drawbridge argued that the recognition order was immediately appealable notwithstanding these features because, in advocating for recognition, the foreign representatives stated their intention to take discovery from the American directors of Drawbridge affiliates. *Id.* at 243. The Second Circuit rejected this argument, noting that, in general, "'potential harm' from a bankruptcy court order is insufficient to justify appellate standing." *Id.* (citing *In re Johns–Manville Corp.*, 843 F.2d 636, 642 n.3 (2d Cir.1988)). Because bankruptcy courts have discretion to deny discovery under 11 U.S.C. § 1521, the Second Circuit reasoned that the recognition order only subjected Drawbridge to "potential future harm." *Id.* Thus, the panel concluded that the recognition order was not appealable by Drawbridge when it was issued. *Id.*

The Second Circuit then went on to consider whether it had appellate jurisdiction over the discovery order—even though the discovery order had not, in fact, been named in the notice of appeal. *Id.* at 243–44. In considering that question, the panel noted the general rule that discovery orders are not final "unless the object of the discovery order refuses to comply and is held in contempt." *Id.* at 243. But it also explained that, under Second Circuit precedents, an exception to this rule applies to discovery orders issued pursuant to 28 U.S.C. § 1782(a)—which allows for discovery "for use in a proceeding in a foreign or international tribunal"—because the discovery order itself "'constitutes the final resolution of a petition to take discovery in aid of a foreign proceeding' and is, therefore, 'immediately appealable.'" *Id.* at 244 (quoting *Chevron Corp. v. Berlinger*, 629 F.3d 297, 306 (2d Cir. 2011)). Because "Chapter 15 proceedings, like Section 1782 proceedings, are ancillary to a 'suit in another tribunal,' such that there will never be a final resolution on the merits beyond the discovery relief itself," the panel reasoned that the same principle applied to Chapter 15 cases. *Id.* (citation omitted) (quoting *Chevron Corp.*, 629 F.3d at 306). Thus, the court held that "the discovery order entered by the Bankruptcy Court was appealable." *Id.*

To further support this conclusion, the Second Circuit noted that it had exercised jurisdiction under analogous circumstances in *In re Fairfield Sentry Ltd.*, 714 F.3d 127 (2d Cir. 2013). In that case, a bankruptcy court recognized the foreign liquidation proceedings of Fairfield Sentry Limited ("Sentry"), which resulted in the imposition of an automatic stay pursuant to 11 U.S.C. § 1520 on a derivative suit that was filed by two of Sentry's shareholders in the United States. *Id.* at 131. The shareholders appealed the bankruptcy court's order imposing the automatic stay, arguing that the recognition of the liquidation proceedings was "manifestly contrary to U.S. public policy" pursuant to 11 U.S.C. § 1506. *Id.* at 132. Although *Fairfield* does not itself discuss the issue of appellate jurisdiction, in *Barnet*, the Second Circuit explained that the shareholders in *Fairfield* had appellate standing "precisely because once recognition is granted, the

imposition of automatic relief [pursuant to Section 1520] requires no further action by the Bankruptcy Court." *In re Barnet*, 737 F.3d at 244. And while the *Barnet* court recognized that the "discretionary relief permitted by Section 1521 requires an extra step," it reasoned that "once that step is taken and the Bankruptcy Court has chosen to exercise its discretion, a party aggrieved by Section 1521 stands in the same position as one aggrieved by Section 1520." *Id.* The panel therefore concluded that "[i]f appellate review is available to one, therefore, it should be available to the other." *Id.*

Having concluded that it would have jurisdiction over an appeal of the discovery order, the panel then found that the discovery order caused the premature notice of appeal from the nonfinal recognition order to ripen into a valid notice of appeal from the discovery order. *Id.* at 244–46. And because "a correctly noticed appeal from the discovery order would bring up for review the [r]ecognition [o]rder," the panel concluded that it could review the recognition order, given that the notice of appeal was properly understood as arising from the discovery order. *Id.* at 246.

The question for the Court is whether *Barnet* supports the Court's exercise of jurisdiction over this appeal. The Appellants argue that this case is squarely governed by *Barnet*. The Foreign Representative argues that it is not. He suggests that *Barnet* is legally suspect insofar as it was decided before *In re Ritzen Group*, in which the Supreme Court noted that "[o]rders in bankruptcy cases qualify as 'final' when they definitively dispose of discrete disputes within the overarching bankruptcy case." 589 U.S. at 37. The *Ritzen* court then applied that principle to conclude that an order granting or denying relief from an automatic stay pursuant to 11 U.S.C. § 362(a) is immediately appealable. *Id.* at 37–38. The Foreign Representative contends that *Barnet* should not be followed because it "did not apply [the] test [outlined in *Ritzen*] and relied instead on case law addressing appeals from orders granting discovery in aid of pending foreign litigation under 29 U.S.C. § 1782." Doc. 13 at 33. But the Second Circuit has not itself suggested that *Barnet* has been abrogated since it decided that case over a decade ago—or in the six

years since *Ritzen*. And, in general, it is not the prerogative of a district court to determine the validity of binding Second Circuit precedent.[9] *See Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Capital Management, LLC*, 105 F.4th 46, 54 (2d Cir. 2024) ("District Courts . . . are obliged to follow our precedent, even if that precedent might be overturned in the near future. . . . [T]he District Court should have applied controlling precedent[,] rather than try to read the Second Circuit's tea leaves."). Thus, even if *Ritzen* cast doubt on the *Barnet*, the Court is still bound by its holding.

The Foreign Representative also argues that *Barnet* is distinguishable on the facts. He notes that, in the Compel Order, the bankruptcy court expressly deferred ruling on certain of the Appellants' objections to the subpoenas and set forth a process for resolving further discovery disputes. Doc. 13 at 31–33. The Foreign Representative asserts that these features of the Compel Order demonstrate that it is not final because they contemplate further action by the bankruptcy court on future discovery disputes. *Id.* at 33. And he suggests that the *Barnet* court could not have been faced with a similar order because it concluded that the discovery order before it "constitute[d] the final resolution of a petition to take discovery." *Id.* at 32–33.

But, as the Appellants note, the discovery order at issue in *Barnet* (the "*Barnet* Order") is publicly available.[10] *See* Joint App'x at A-662–65, *In re Barnet*, 737 F.3d 238 (No. 13-612). And like the Compel Order, it too contemplated further discovery proceedings. In fact, the *Barnet* Order merely *authorized* the foreign representatives to serve document requests and subpoenas from certain parties, subject to the bankruptcy

[9] Nor does the Foreign Representative argue that this appeal presents the "rare" exception to that rule that applies where "an intervening Supreme Court decision has so clearly undermined [Second Circuit] precedent that it will almost inevitably be overruled." *Packer*, 105 F.4th at 54 n.36. Indeed, it would be hard to see how *Ritzen* could "so clearly" have that effect, given that it applied existing finality precedents to a different category of bankruptcy order.

[10] The Court may take judicial notice of the discovery order in *Barnet*. *See Global Network Communications, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (explaining that a "court may take judicial notice of a document filed in another court . . . to determine what the document[] stated").

court's ability to consider and decide future objections. And in doing so, the bankruptcy court expressly preserved the rights of the discovery targets "to object to individual discovery requests," set forth a schedule for raising such objections, and noted that, if the parties were unable to resolve any disputes consensually, it would "hear any such objection and set a deadline for the [objecting parties] to respond if [their] objection [was] overruled." *Id.* at A-664. In setting forth this general process, the bankruptcy court also explicitly preserved Drawbridge's right to object to specific requests based on the pending proceeding rule[11]—which Drawbridge had raised in its opposition to the underlying motion. *Id.* at A-664, 333–38. Thus, like the Compel Order, the *Barnet* Order not only contemplated future discovery proceedings but deferred ruling on at least one of the parties' specific discovery objections.

Thus, the Second Circuit in *Barnet* was presented with an order that was materially identical to the one at issue in this appeal. And in holding that the *Barnet* Order was final, the Second Circuit did not consider these features disqualifying. That outcome is not surprising—the Second Circuit's holding in *Barnet* was premised on the unique nature of Chapter 15 proceedings, and, in particular, the absence of "a final resolution on the merits" in those proceedings "beyond the discovery relief itself." *In re Barnet*, 737 F.3d at 244. The Second Circuit therefore reasoned that once a bankruptcy court "has chosen to exercise its discretion" to grant relief pursuant to Section 1521, appellate review of that exercise of its discretion—and any interlocutory orders that preceded it—must be available. *Id.* In *Barnet*, the bankruptcy court exercised its discretion pursuant to Section 1521(a) to seek discovery and serve subpoenas. And here, the bankruptcy court exercised its discretion pursuant to the same provision to compel compliance with the Foreign Representative's subpoenas. Like the *Barnet* Order, the

[11] The pending proceeding rule "limits a debtor's use of Rule 2004 bankruptcy discovery in other pending lawsuits where the debtor is a party." *In re China Medical Technologies, Inc.*, No. 13 Civ. 6222 (AT), 2013 WL 6667789, at *2 (S.D.N.Y. Dec. 17, 2013).

Compel Order is therefore final and appealable. *Cf. Markus v. Rozhkov*, 615 B.R. 679, 698 (S.D.N.Y. 2020) (explaining that the "type of discovery order" issued in a Chapter 15 case does not impact whether the order was final because *Barnet* based its holding on the fact "that there will never be a final resolution on the merits beyond the discovery relief itself").

In resisting this conclusion, the Foreign Representative relies on a handful of district court cases from within and outside of this District. Doc. 13 at 31–32. He contends that these cases hold that "an order that authorizes a party to take discovery in a bankruptcy case but does not resolve related disputes over the scope of that discovery is interlocutory." *Id.* at 31. Of course, even if these cases counseled a contrary result, the Court is obligated to follow *Barnet* as binding Second Circuit precedent. Furthermore, nearly all of those cases are distinguishable insofar as they arise outside of the Chapter 15 context. *See, e.g.*, *Hongkong & Shanghai Banking Corp. Ltd. v. Brandt for CFG Peru Investments Pte. Ltd. (Singapore)*, No. 17-CV-6672 (VEC), 2017 WL 6729191 (S.D.N.Y. Dec. 29, 2017); *Gache v. Balaber-Strauss*, 198 B.R. 662 (S.D.N.Y. 1996); *In re Blinder, Robinson & Co.*, 127 B.R. 267, 272 (D. Colo. 1991); *In re Gray*, 447 B.R. 524 (E.D. Mich. 2011). Many of them also pre-date *Barnet* and thus do not engage with its reasoning or holding.

The Foreign Representative does identify two cases that both implicate Chapter 15 and post-date *Barnet*. But one of those cases, *In re Comair Ltd.*, does not grapple with the aspects of the *Barnet* Order just discussed and instead appears to assume that the Second Circuit was faced with an order that required "no further action" *at all* from the bankruptcy court. *See In re Comair Ltd.*, No. 21 Civ. 10146 (AT), 2023 WL 171892, at *3 (S.D.N.Y. Jan. 12, 2023). *Comair* is also distinguishable insofar as the parties in that case disputed whether other procedural developments—including in the underlying foreign proceeding—impacted the appeal. *Id.*

The other case, *In re Transbrasil S.A. Linhas Aereas*, is an unpublished decision from the Eleventh Circuit, and thus not even binding in that Circuit—let alone this one. *In re Transbrasil S.A. Linhas Aereas*, 860 F. App'x 163 (11th Cir. 2021). In any event, the *Transbrasil* court's three reasons for departing from *Barnet* do not support the same result here. The *Transbrasil* court first distinguished *Barnet* because it "did not wrestle" with *Ritzen* in its analysis. *Id.* at 169. But, as the Court has explained, it is not the prerogative of a district court to question the validity of binding circuit precedents absent exceptional circumstances not presented here. Second, the *Transbrasil* court disagreed with the *Barnet* court's analogy to Section 1782(a). *Id.* at 169 n.8. This Court, however, is bound by *Barnet* regardless of the persuasiveness of its reasoning. Thus, this ground for distinction is also unavailing. Third, and finally, the *Transbrasil* court distinguished *Barnet* on its facts: it found that, unlike in *Barnet*, it was "clear" from the record that the foreign representative "sought the discovery in part to aid in implementing" a foreign bankruptcy order in the U.S. bankruptcy court, and thus that the discovery order was a preliminary step in a proceeding that would ultimately implement the foreign bankruptcy order. *Id.* at 169. In an attempt to capitalize on this reasoning, the Foreign Representative argues that the Court is faced with a similar situation here. He contends that the Compel Order was a preliminary step "in aid of investigating potential claims against the Binetter Parties and others who reside here in the United States." Doc. 13 at 35. But, even if that were true, *Barnet* did not recognize an exception to its general finality rule for these circumstances. In any event, the potential for further proceedings in this appeal is far more speculative than in *Transbrasil*, which involved an order from a foreign court that explicitly contemplated a direct petition for enforcement in a U.S. bankruptcy court. *Id.* at 168. Thus, *Transbrasil* offers no reason to depart from *Barnet*.

In sum, the Court concludes that this case falls squarely within *Barnet*'s ambit. Thus, the Compel Order is final and appealable based on a straightforward application of *Barnet*, notwithstanding its recognition that there may be further proceedings regarding

discovery issues not contested in this appeal. And because a proper appeal from a Chapter 15 discovery order brings up the review of an interlocutory recognition order, the Court may also consider the Appellants' challenge to the Recognition Order. *In re Barnet*, 737 F.3d at 246.

## III. MERITS

Having assured itself of its jurisdiction, the Court now proceeds to the merits. The Appellants' only argument on appeal centers around the proper interpretation of Section 109(a) of the Bankruptcy Code. Because this presents a purely legal question, the Court's review is de novo.[12] *In re Charter Communications, Inc.*, 691 F.3d 476, 482–83 (2d Cir. 2012).

As the Court has noted, Section 109(a) provides that "only a person that resides or has a domicile, a place of business, or property in the United States, or a municipality, may be a debtor under this title." 11 U.S.C. § 109(a). In *Barnet*, the Second Circuit held that this provision applies to Chapter 15 cases. *In re Barnet*, 737 F.3d at 247. "The debtor that is the subject of [a] foreign proceeding, therefore, must meet the requirements of Section 109(a) before a bankruptcy court may grant recognition of the foreign proceeding." *Id.*

The bankruptcy court found that the New Foreign Debtors satisfied Section 109(a) because they had each placed $1,250 in the trust account of the Foreign Representative's U.S. counsel as a retainer two days before the Foreign Representative petitioned for recognition and therefore had "property in the United States." Doc. 9-2 at 567; Doc. 9-1 at 551. In doing so, the bankruptcy court adhered to the rulings of apparently every court that has considered this issue, which have concluded that even a nominal amount of property in the United States satisfies 109(a)'s property requirement, and that property for

[12] The Court may consider this argument on appeal because it was previously raised to the bankruptcy court. *See Universal Church v. Geltzer*, 463 F.3d 218, 228–29 (2d Cir. 2006).

the purposes of Section 109(a) includes funds in a retainer account for a foreign representative's U.S. counsel.[13]

The Appellants do not dispute that an attorney retainer is "property" within the meaning of Section 109(a), or that the retainers here belonged to the New Foreign Debtors and were located "in the United States." They also concede that Section 109(a) "has no minimum property requirement" and that a "deposit of $1,250 on the eve of filing" in a retainer account therefore constitutes "technical compliance" with its provisions. Doc. 9 at 32, 41. In other words, the Appellants concede that the New Foreign Debtors have satisfied the plain meaning of Section 109(a). *Id.* Ordinarily, a concession of that type would end the Court's inquiry. *See Bostock v. Clayton County*, 590 U.S. 644, 674 (2020) ("[W]hen the meaning of the statute's terms is plain, our job is at an end."); *United States v. Kozeny*, 541 F.3d 166, 171 (2d Cir. 2008) ("Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms." (citation modified)). Yet the Appellants nonetheless offer several arguments for why the bankruptcy court's ruling rests on a misreading of the statute. Doc. 9 at 24–27. The Court is not persuaded by these arguments for the reasons set forth below.

**A. Surplusage**

To challenge the bankruptcy court's interpretation of Section 109(a), the Appellants first invoke the canon against surplusage. Under that canon, "[s]tatutes must be interpreted, if possible, to give each word some operative effect." *Walters v. Metropolitan Educational Enterprises, Inc.*, 519 U.S. 202, 209 (1997). Thus, courts have

---

[13] This includes at least one district court outside of this Circuit, *In re Forge Grp. Power Pty Ltd.*, No. 17-CV-02045 (PJH), 2018 WL 827913, at *12–13 (N.D. Cal. Feb. 12, 2018), and numerous bankruptcy courts within it, *see, e.g.*, *In re Octaviar Administration Pty Ltd.*, 511 B.R. 361, 373–74 (Bankr. S.D.N.Y. 2014); *In re Berau Capital Resources Pte Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. 2015); *In re Inversora Electrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016); *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 610 (Bankr. S.D.N.Y. 2017); *In re Poymanov*, 571 B.R. 24, 30 (Bankr. S.D.N.Y. 2017); *In re Ascot Fund Ltd.*, 603 B.R. 271, 277 (Bankr. S.D.N.Y. 2019); *In re Olinda Star Ltd.*, 614 B.R. 28, 39-40 (Bankr. S.D.N.Y. 2020); *In re Agro Santino, OOD*, 653 B.R. 79, 88 (Bankr. S.D.N.Y. 2023).

a duty, if possible, to avoid constructions of a statute that would render a word or clause "wholly superfluous." *Duncan v. Walker*, 533 U.S. 167, 174 (2001).

The Appellants argue that the bankruptcy court's interpretation of Section 109(a) violates this canon because it renders the property requirement "meaningless." Doc. 9 at 32. In support of this contention, they note that, in the absence of a minimum property requirement, a foreign debtor could "place a dollar" in a U.S. bank account and satisfy Section 109(a). Doc. 9 at 32. And they argue that "[a]ll foreign debtors" can afford to do that because it costs $1,738 to file a Chapter 15 petition. *Id.* Thus, they suggest that the canon against surplusage requires the Court to interpret Section 109(a) "in a manner that does not allow any party to easily defeat its requirements." *Id.* at 33.

Of course, the New Foreign Debtors did not merely place a dollar in an American bank account—they each placed $1,250 in a trust account held by the Foreign Representative's counsel as a retainer for legal services. But even if the New Foreign Debtors did possess only a nominal amount of property in the United States at the time of filing, that fact would not demonstrate that Section 109(a)'s property requirement is "inoperative or superfluous." *In re Barnet*, 737 F.3d at 249. It would just reflect that Section 109(a)'s property requirement imposes a low bar. And, contrary to the Appellants' suggestion, the canon against surplusage does not require courts to *heighten* clear statutory requirements just because they are easily satisfied. It merely requires that, where possible, each word and clause of a statute be given "some operative effect." *Walters*, 519 U.S. at 209. And if a foreign debtor who otherwise lacks property in the United States must transfer even a nominal amount of property here, Section 109(a)'s property requirement has had "some operative effect." *Id.* Thus, even in that extreme scenario, the property requirement is not superfluous. *Cf. Duncan*, 533 U.S. at 174 (rejecting an interpretation of a statute that would result in the "precisely the same" meaning if a particular word were omitted).

In fact, to adopt the Appellants' construction of the statute, the Court would essentially be required to amend Section 109(a), through, for example, specifying that a debtor's property must be "substantial" or obtained for purposes other than establishing Section 109(a) eligibility. But Congress did not include these modifiers in the statute. It simply stated that a person is a debtor if he has "property in the United States." 11 U.S.C. § 109(a). And "[i]t is not the province of the courts to add words to statutes that Congress has enacted." *Knight First Amendment Institute at Columbia University v. United States Citizenship & Immigration Services*, 30 F.4th 318, 331 (2d Cir. 2022).

**B. Absurdity**

Perhaps in recognition of this infirmity, the Appellants argue that the Court should depart from the plain meaning of Section 109(a) because it results in absurd consequences. In general, it is "well-established that a statute should be interpreted in a way that avoids absurd results.'" *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699, 705 (2d Cir. 2019) (citation modified). "That being said, a statute is not 'absurd' merely because it produces results that a court or litigant finds anomalous or perhaps unwise." *Id.* Rather, "courts should look beyond a statute's text under the canon against absurdity only where the result of applying the plain language would be, in a genuine sense, absurd, *i.e.*, where it is quite impossible that Congress could have intended the result and where the alleged absurdity is so clear as to be obvious to most anyone." *Id.* at 705–06.

In invoking the absurdity canon, the Appellants raise two arguments. They assert, first, that it is "facially absurd" to allow "any party" to "essentially purchase its right to meet [S]ection 109's eligibility requirement by depositing less than the cost of a bankruptcy petition or an hour of an attorney's pay," because the Second Circuit held in *Barnet* that Section 109(a) applies to Chapter 15 "on account of the superfluidity canon." Doc. 9 at 43. The *Barnet* court did reject an interpretation of the Bankruptcy Code that would result in Section 109(a) "hav[ing] no application under any circumstances." *In re Barnet*, 737 F.3d at 249. But the interpretation that the *Barnet* court rejected had nothing

to do with the property requirement in Section 109(a). It instead focused on whether the Chapter 15-specific requirements for debtors set forth in Section 1502 supplanted the requirements set forth in Section 109(a). Thus, the Second Circuit's application of the surplusage canon says nothing about whether it applies here—or whether allowing a party to "essentially purchase its right to meet [S]ection 109's eligibility requirement" is genuinely absurd. Implicit in this argument is perhaps another contention: namely, that in holding that Section 109(a) should not be rendered superfluous, the Second Circuit suggested that Section 109(a)'s requirements should be construed to impose a substantial or formidable barrier to entry. But in applying the canon against surplusage, the Second Circuit suggested no more than that the words of Section 109(a), like any other statute, should, where possible, be given some operative effect. Thus, the Appellants read too much into the Second Circuit's application of that canon.

In support of their argument that the plain meaning of Section 109(a) produces an absurd result, the Appellants also invoke the statute's purpose. They assert that, in enacting Section 109(a), Congress "clearly intended a United States presence as a prerequisite to eligibility." Doc. 9 at 44. The Appellants do not explain what they mean by "a United States presence" or why a debtor's possession of some amount of property in the United States prior to filing does not suffice. To the extent that they mean to argue that Congress intended for debtors to have a substantial presence in United States—whatever substantial presence might mean—they do not offer any support for that contention. Indeed, the only evidence that they provide of this alleged purpose is the following language from a House Judiciary Committee report, which simply reiterates the statute's text: "[Section 109] specifies eligibility to be a debtor under the bankruptcy laws. The first criterion, found in the current Bankruptcy Act § 2a, requires that the debtor reside or have a domicile, a place of business, or property in the United States." H.R. Rep. No. 95-595, at 318 (1977). Thus, the report does not suggest any purpose other than the one expressed by Section 109(a)'s plain meaning.

In their reply, the Appellants also claim that Congress's "purpose" in enacting Section 109(a) "was to ensure some jurisdictional relationship with the United States before a [c]ourt would exercise jurisdiction over a person or *res*." Doc. 14 at 25–27. But here, again, they do not explain how the placement of retainers in trust accounts in the United States prior to filing fails to "ensure some jurisdictional relationship with the United States." *Id.* To the extent that the Appellants mean to suggest that Congress intended for courts to look beyond the mere presence of property in the United States to determine Section 109(a) eligibility, the only case they cite, *In re Berthoud*, contradicts that assertion. Indeed, in that case, the court explicitly noted that the "residence or domicile or the locus of the principal place of business is immaterial if there is property within the United States and [that] the statute confers jurisdiction even in the case of those who have been adjudged bankrupts by courts of competent jurisdiction without the United States, provided that such persons have property within the jurisdictions of the United States." *In re Berthoud*, 231 F. 529, 532 (S.D.N.Y. 1916). The court then expressed its view that Congress intended to confer jurisdiction over all persons who had property here, regardless of the strength of their overall relationship with this country:

> [I]t is apparent that Congress intended that the United States courts should deal with and administer the estates of bankrupts if property existed and was found within our borders. Starting with this premise, it logically follows that Congress did not mean to exclude from the operation of the act those persons who are aliens, whether living here or abroad, who have property within the United States.

*Id.* *Berthoud* therefore reflects an expansive understanding of congressional purpose and rejects a view of the statute that looks beyond the mere presence of property in the United States. Thus, neither *Berthoud* nor the House Judiciary Committee report suggest that "it is quite impossible that Congress could have intended" for Section 109(a)'s plain meaning to apply. *Gibbons*, 919 F.3d at 706. Rather, it is just as plausible, if not more plausible, that Congress intended to impose an easily administrable rule. *See Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (explaining that "administrative simplicity is a major

virtue in a jurisdictional statute" and that "[a]ccepting occasionally counterintuitive results is the price the legal system must pay to avoid overly complex jurisdictional administration while producing the benefits that accompany a more uniform legal system").

In sum, the Appellants have not shown that applying the plain language of Section 109(a) results in an outcome that is absurd. Thus, they have offered no reason to depart from the text of the statute on that basis.

**C. Manipulation & Gamesmanship**

In resisting the plain meaning of the statute, the Appellants also highlight that it creates the opportunity for "manipulation" and "gamesmanship." Doc. 9 at 33. They suggest that, as a general matter, courts must interpret statutes to limit such opportunities. *Id.* And they contend that this principle applies with particular force in cases involving questions of jurisdiction. *Id.*

The problem for the Appellants is that this interpretative principle simply does not exist. There is no canon against manipulation or gamesmanship. And even if there were, there is certainly no canon that compels—or even encourages—courts to rely on these considerations to negate the unambiguous words of a statute. Quite the opposite: the "cardinal canon" of statutory interpretation is that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut National Bank v. Germain*, 503 U.S. 249, 253–54 (1992). And "[w]hen the words of a statute are unambiguous, then, this first canon is also the last" and "judicial inquiry is complete." *Id.* at 254. Thus, the potential for "manipulation" or "gamesmanship" does not warrant a departure from Section 109(a)'s text.

Nor do the cases cited by the Appellants compel a different result. To be sure, in some of those cases, courts did adopt constructions of statutes that would prevent attempts to circumvent their requirements. And in doing so, they sometimes explicitly referenced concerns about manipulation and gamesmanship. But those courts only relied

on these considerations to interpret statutes that were ambiguous. *See, e.g.*, *Roberts v. Sea-Land Services, Inc.*, 566 U.S. 93, 100–07 (2012) (relying on various "contextual and structural considerations," including the prevention of "gamesmanship in the claims process," to interpret a statute, but only after determining that the text, "in isolation, [was] indeterminate"); *In re Fairfield Sentry Ltd.*, 714 F.3d at 133–37 (adopting an interpretation of "center of main interests" ("COMI") that "offset[s] a debtor's ability to manipulate its COMI," but only after concluding that the statutory text did not definitively resolve the term's meaning and noting that international interpretations of the term "reflect a concern about possible COMI manipulation"); *Board of Education of Westside Community Schools v. Mergens ex rel. Mergens*, 496 U.S. 226, 238, 244–45 (1990) (rejecting an interpretation of the term "noncurriculum related student group" that would "permit[] schools to evade" a statute's requirements only after determining that the text of the statute was "sufficiently ambiguous" that resort to congressional purpose was appropriate); *Whiting v. Dow Chemical Co.*, 523 F.2d 680, 686 (2d Cir. 1975) (considering dueling interpretations of the term "beneficial owner," and after finding that the question "cannot be resolved by legal interpretation," rejecting an interpretation that "would open the door to patent abuse which Congress sought to prevent"). And in referencing these considerations, these cases drew from concrete sources of congressional intent, which reflected a desire to specifically prohibit the manipulation of the underlying statutes. *See, e.g.*, *In re Fairfield Sentry Ltd.*, 714 F.3d at 133–37 (consulting "foreign law, as directed by the statute" to further the "congressional purpose of achieving international uniformity in cross-border insolvency proceedings" and determining that foreign law supported an interpretation that helped "to ensure that a debtor has not manipulated its COMI in bad faith"); *Mergens*, 496 U.S. at 239, 244–45 (relying on legislative history to determine that Congress sought to "do more than merely validate the status quo" and limit schools' ability to "render the Act merely hortatory"); *Whiting*, 523 F.2d at 689 (relying on the fact that Congress had enacted a "catch-all type of statute" to

determine that "Congress sought to prevent" an interpretation that would enable the potential for "abuse"). Here, by contrast, the Appellants offer no evidence from the text, structure, or legislative history that suggests that Congress sought to prevent debtors from satisfying Section 109(a)'s property requirement in the manner that occurred here. Thus, these cases offer no reason to depart from the statute's text.

In support of their theory that statutes must be read to thwart attempts at manipulation, the Appellants also cite cases in which courts have warned about parties' attempts to manufacture jurisdiction or statutory eligibility. They suggest that these cases require courts to inquire into the reasons why a party has satisfied a statute's requirements—even when there is no dispute that the party has, in fact, satisfied them. But these cases state no such thing. They simply hold that, when determining whether a party falls within the terms of a statute, courts need not accept parties' unsupported assertions of compliance. *See, e.g.*, *E.R. Squibb & Sons, Inc. v. Accident & Casualty Insurance Co.*, 160 F.3d 925, 929 (2d Cir. 1998) (recognizing that "jurisdiction is not a game" and that "no amount of agreement by the parties can create jurisdiction where none exists"). Rather, parties "must support their allegations [of compliance] by competent proof." *Hertz*, 559 U.S. at 96–97. In other words, a court must determine for itself whether a party has satisfied the terms of a statute, based on what the record shows about the facts on the ground. *See e.g.*, *id.* at 97 (explaining that, in determining the location of a corporation's "principal place of business," courts must look to "the place of actual direction, control, and coordination," rather than deferring to a party's conclusory assertion regarding the location of its "principal executive offices"); *Gregory v. Helvering*, 293 U.S. 465, 468–70 (1935) (explaining that, to determine whether a party has satisfied the statutory requirement that a transfer be made "in pursuance of a plan of reorganization," a court must focus on "what actually occurred," and that "if a reorganization in reality was effected within the meaning of" the statute, then a party's "ulterior purpose" in complying with the statute is "not pertinent"); *In re Ultra Petroleum*

*Corp.*, 51 F.4th 138, 145–46 (5th Cir. 2022) (noting that parties cannot circumvent the Bankruptcy Code's disallowance for claims "for unmatured interest" by simply "recharacterizing as 'principal' what is essentially interest"). Here, by contrast, the Appellants do not dispute that the New Foreign Debtors have actually satisfied the terms of Section 109(a)—they concede that, at the time of filing, the New Foreign Debtors had funds in a U.S.-based trust account. Thus, this appeal does not present the kind of manipulation contemplated by these cases.

In their effort to prove the existence of an alleged manipulation- or gamesmanship-canon, the Appellants also spill much ink on *In re Patriot Coal Corp.*, 482 B.R. 718 (Bankr. S.D.N.Y. 2012). They suggest that that case supports their argument that the Court should disregard the New Foreign Debtors' literal compliance with Section 109(a)'s plain terms based on their "manufactured connections to the district." Doc. 9 at 34. It does not. For one, even if *Patriot* directly supported that proposition, it is not binding on this Court. In any event, *Patriot* did not disregard any party's literal compliance with any statute. Indeed, the *Patriot* court found that the debtors in that case "did in fact comply" with Section 1408's venue requirements even though they did so through the "purposeful creation of . . . venue-predicate affiliates in New York on the eve of filing." *In re Patriot Coal Corp.*, 482 B.R. at 743. But the court concluded that "*how* [the debtors] complied with the statute must be taken into account when considering the 'interest of justice' prong of [S]ection 1412['s transfer provision]." *Id.* at 743 (emphasis added). Thus, it determined that the debtors' "creation of venue" did not serve the interests of justice and instead warranted transfer. *Id.* at 745. Here, however, there is no statute that permits the Court to consider the New Foreign Debtors' method of compliance or whether it serves the interest of justice.[14] And the Court cannot rewrite

[14] The Appellants' reliance on *In re Winn-Dixie Stores, Inc.*, No. 05-11063 (RDD) (Bankr. S.D.N.Y. 2005), is unavailing for the same reason. And the aspects of *In re Head*, 223 B.R. 648 (Bankr. W.D.N.Y. 1998), that the Appellants rely on are dicta.

the statute to comport with the Appellants' sense of that term. Thus, *Patriot* is distinguishable.

**D. Remaining Arguments**

The Appellants' remaining arguments merit only a brief discussion. They contend that the Court should reject the bankruptcy court's ruling because "[i]t is not unusual for the Supreme Court or other Article III Courts to reject policy-driven practices promoted by Bankruptcy Courts on statutory construction grounds." Doc. 9 at 45. But the bankruptcy court's ruling here was not policy-driven—it was based on sound principles of statutory interpretation. Thus, the examples that the Appellants offer from other contexts are inapposite.

The Appellants finally argue that, if the Court adopts their interpretation, access to discovery might still be available to the Foreign Representative through 28 U.S.C. § 1782(a). *Id.* at 50–52. But even if that is true, it offers no reason to disregard the straightforward text of Section 109(a).

## IV. CONCLUSION

In sum, the Appellants offer no reason to depart from the plain meaning of Section 109(a), which requires only some amount of property in the United States. Because the New Foreign Debtors have satisfied that requirement, the decision of the bankruptcy court is AFFIRMED. The Appellants' request for oral argument is also DENIED pursuant to Federal Rule of Bankruptcy Procedure 8019(b)(3). The Clerk of the Court is respectfully directed to close the case.

It is SO ORDERED.

Dated: September 29, 2026
New York, New York

EDGARDO RAMOS, U.S.D.J.